DCP:ADR/DJM
F. #2021R00699

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ANIMASHAUN ADEBO,
    also known as "Kazeem"
    and "Kazeem Animashaun," and
IDOWU ADEMOROTI,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
*    JUNE 7, 2024    *
BROOKLYN OFFICE

I N D I C T M E N T

Cr. No. 24-CR-239
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b)(1), 1956(h), 1960(a),
1349, 2315, 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

Judge Allyne R. Ross
Magistrate Judge Sanket J. Bulsara

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    Background

    A.    The Defendants, Their Co-Conspirators and Relevant Entities

        1.    The defendant ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," was a citizen of Nigeria and a resident of the United States.

        2.    The defendant IDOWU ADEMOROTI was a citizen of Nigeria and a resident of the United States.

        3.    Q&A LLC was a corporation registered in Wisconsin on or about July 31, 2020. The registered agent for Q&A LLC, and the signatory to its corporate bank accounts, was the defendant IDOWU ADEMOROTI.

1

4.      Co-Conspirator-1, an individual whose identity is known to the Grand Jury, was a citizen and resident of Nigeria.

5.      Co-Conspirator-2, an individual whose identity is known to the Grand Jury, was a citizen and resident of Nigeria.

6.      Co-Conspirator-3, an individual whose identity is known to the Grand Jury, was a citizen of Nigeria and the United States and a resident of Nigeria and the United States.

7.      Co-Conspirator-4, an individual whose identity is known to the Grand Jury, was a citizen of Cameroon and a resident of the United States.

8.      Co-Conspirator-5, an individual whose identity is known to the Grand Jury, was a citizen of Germany and a resident of the United States.

B.      Relevant Terms and Definitions

9.      A business email compromise ("BEC") scheme is a form of cyber-enabled financial fraud.  In a typical BEC scheme, a malicious actor compromises legitimate business email accounts through computer intrusion techniques or social engineering and uses those accounts to cause the unauthorized transfer of funds.  Techniques for perpetrating these schemes include identity theft, spoofing of emails and websites and the use of malware.

10.     Confidence fraud is another form of cyber-enabled financial fraud.  In a typical confidence fraud, a malicious actor befriends and gains the confidence of another individual through online communications and uses that confidence to cause the transfer of funds for unauthorized purposes.  A romance scheme is a type of confidence fraud wherein the perpetrator adopts a fictitious online identity to gain a victim's affection and trust.  The

2

perpetrator then uses the illusion of a romantic relationship to cause the transfer of funds for unauthorized purposes.

II.     The Fraudulent Schemes

11.     In or about and between April 2021 and March 2022, the defendant ANIMASHAUN ADEBO, together with others, orchestrated a series of fraudulent BEC schemes and related schemes that resulted in millions of dollars in losses by individuals and small businesses located within the Eastern District of New York and throughout the United States. During that period, ADEBO and the defendant IDOWU ADEMOROTI, together with others, received proceeds from the fraudulent schemes and laundered those proceeds. As part of the laundering, ADEMOROTI operated an illegal money transmitting business in which he facilitated the trading of fraudulent U.S. dollar proceeds to individuals overseas in exchange for Nigerian naira.

12.     As one part of the BEC schemes, victim-individuals involved in real estate transactions received fraudulent emails purporting to be from legitimate parties to those transactions. The emails instructed them to wire funds they believed to be related to the real estate transactions to specified bank accounts. The fraudulent email accounts that contacted the victims closely resembled, but were slightly different from, the email addresses of the legitimate parties to the transaction (a process known as "spoofing").

13.     As another part of the BEC schemes, employees of victim-companies received fraudulent emails purporting to be from legitimate vendors or other business partners of those companies directing them to transfer funds to specified bank accounts. The employees were also defrauded through email spoofing and received fraudulent emails from accounts that

3

closely resembled, but were slightly different from, the email addresses of the legitimate vendors and business partners.

14.    In each case, after the victims executed the wires in accordance with the fraudulent instructions, the transferred funds were misappropriated from the victims and sent to and through accounts controlled by the defendants and their co-conspirators.

A.    The Real Estate BEC Schemes and Laundering of Fraudulent Proceeds

15.    As one example of the real estate BEC schemes, in or about July 2021, an individual residing in Brooklyn, New York, whose identity is known to the Grand Jury ("Victim-1"), was in the process of purchasing a new home. On or about July 6, 2021, Victim-1 received a series of emails purporting to be from Victim-1's lawyer directing Victim-1 to wire "closing funds" to a specified bank account. However, the emails, on which Victim-1's spouse and real estate broker were also copied, were fraudulent emails that were not sent by Victim-1's lawyer. Instead, they were sent by Co-Conspirator-1 using an email account that closely resembled, but was slightly different from, the legitimate email account of Victim-1's lawyer (the "Fraudulent Lawyer Account"). Later that day, Victim-1 and Victim-1's spouse wired approximately $450,000, which comprised the balance of the purchase price of the new home, to the bank account provided in the fraudulent emails.

16.    The proceeds of the fraud on Victim-1 were subsequently sent to and through multiple accounts, eventually ending up in corporate accounts controlled by the defendants ANIMASHAUN ADEBO and IDOWU ADEMOROTI and their co-conspirators, both in the United States and abroad.

17.    In particular, the account that received Victim-1's $450,000 payment belonged to an escrow attorney, an individual the identity of whom is known to the Grand Jury

4

("Escrow-Attorney-1"). Escrow-Attorney-1 had been contacted by Co-Conspirator-2, who, using a fake name, falsely represented that he was sending Escrow-Attorney-1 funds for the purchase of construction equipment and requested that Escrow-Attorney-1 pass the funds along to specified accounts to execute the purchase. In fact, Escrow-Attorney-1 received Victim-1's home purchase funds and passed them along to two corporate bank accounts controlled by Co-Conspirator-3 (the "Co-Conspirator-3 Accounts").

18.    Shortly after receiving the wire transfers, Co-Conspirator-3 substantially depleted the Co-Conspirator-3 Accounts through the purchase of three cashier's checks payable to Q&A LLC, a corporate entity registered to the defendant IDOWU ADEMOROTI. The checks were deposited into two corporate bank accounts for Q&A LLC controlled by ADEMOROTI. At the direction of the defendant ANIMASHAUN ADEBO, Co-Conspirator-4 facilitated the movement of the funds from Co-Conspirator-3 to ADEMOROTI. ADEBO, ADEMOROTI and Co-Conspirator-4 then further laundered the funds by unlawfully trading them to individuals overseas who were seeking to exchange Nigerian naira for United States dollars. In particular, over a series of transactions, Co-Conspirator-4 directed the fraudulent dollar proceeds to ADEMOROTI, which ADEMOROTI then passed on to customers of his illegal money transfer business. In return, ADEMOROTI's customers deposited Nigerian naira into accounts at Nigerian financial institutions provided by Co-Conspirator-4, including accounts controlled by Co-Conspirator-4 and by ADEBO. ADEMOROTI kept a portion of the funds as a fee.

19.    As another example of the real estate BEC schemes, in or about February 2022, an individual residing in Manhattan, New York, whose identity is known to the Grand Jury ("Victim-2"), was in the process of selling his home. In connection with the sale, a title insurance company, an entity the identity of which is known to the Grand Jury (the "Title

Company"), was to collect the buyer's purchase funds and make a payment to Victim-2's mortgage lender to pay off the existing mortgage on his home. On or about February 22, 2022, Victim-2 received a mortgage payoff statement from an email address purporting to be associated with his mortgage lender. The email provided wire instructions and an account to which the Title Company should send the mortgage payoff funds. However, the email was fraudulent and was not sent by an address associated with the mortgage lender but rather from a slightly misspelled version of that email address. On or about February 25, 2022, the Title Company wired approximately $1,319,669 on behalf of Victim-2 to the account provided in the fraudulent email.

20. The account that received the $1,319,669 payment belonged to an escrow attorney, the identity of whom is known to the Grand Jury ("Escrow-Attorney-2"). Escrow-Attorney-2 had been contacted by Co-Conspirator-2, who, using a fake name, requested that Escrow-Attorney-2 help facilitate the purchase of construction equipment. Co-Conspirator-2 requested that Escrow-Attorney-2 pass the funds along to specified accounts to make the purchase. In fact, Escrow-Attorney-2 received Victim-2's mortgage payoff funds sent by the Title Company and passed the funds along to two corporate bank accounts controlled by Co-Conspirator-5, among other accounts. Shortly after receiving the wire transfers, at the direction of the defendant ANIMASHAUN ADEBO, Co-Conspirator-5 purchased three luxury wrist watches for approximately $319,000, which were ultimately provided to ADEBO.

B.    The Corporate BEC Schemes and Laundering of Fraudulent Proceeds

21. In addition to the real estate BEC schemes, the defendants and their co-conspirators also engaged in BEC schemes targeting corporate entities. As one example of this kind of BEC scheme and a related romance scheme, on or about May 21, 2021, an employee of a veterinary practice center located in Westport, Connecticut, an entity the identity of which is

6

known to the Grand Jury ("Victim-3"), received an email from one of its legitimate vendors, a pharmaceutical company located in Germany, regarding outstanding payment on invoices. On or about May 24, 2021, another employee of Victim-3 received an email regarding the outstanding invoices with instructions to wire funds to a specified bank account. However, this email was fraudulent and was not sent by Victim-3's vendor, and the domain from which it was sent bore a misspelled version of the vendor's name. On or about that same day, Victim-3 wired approximately $459,453 to the bank account provided in the fraudulent email. On or about June 3, 2021, Victim-3 further wired approximately $1,117,036 to the same account.

22. The account that received Victim-3's $459,453 and $1,117,036 wires belonged to an individual residing in Vienna, Virginia, whose identity is known to the Grand Jury, and who was himself the victim of a romance scheme ("Victim-4"). As part of the romance scheme, an individual using the fraudulent identity "Nicole Newton" ("Newton") befriended Victim-4 on an online dating platform and, having gained Victim-4's trust and affection, repeatedly extracted money from Victim-4 under false pretenses.

23. Prior to Victim-4's receipt of the wires from Victim-3, "Newton" told Victim-4 to expect money in his account. Once Victim-4 received the wires, "Newton," along with other individuals acting with "Newton," instructed Victim-4 to use the funds to purchase official checks, make cash withdrawals, send wires and transfer funds to cryptocurrency exchanges.

24. On or about May 26, 2021, "Newton," and the individuals acting with "Newton," instructed Victim-4 to write a check to Q&A LLC, the entity controlled by the defendant IDOWU ADEMOROTI, in the amount of $137,500, and to send it to an address in Chicago, Illinois. On or about June 5, 2021, "Newton," and the individuals acting with

7

"Newton," instructed Victim-4 to write a check to Q&A LLC in the amount of $157,300, and to send it to an address in Chicago, Illinois. Victim-4 completed the transactions as instructed and sent the checks to the addresses provided. Both checks were subsequently deposited into corporate bank accounts for Q&A LLC controlled by ADEMOROTI.

25.    At the direction of the defendant ANIMASHAUN ADEBO, Co-Conspirator-4 facilitated the transfer of the checks from Victim-4 to the defendant IDOWU ADEMOROTI and, together with ADEMOROTI, laundered those funds by unlawfully trading them to individuals seeking to receive United States dollars in exchange for Nigerian naira in substantially the same manner as described above, with naira ultimately being deposited into a Nigerian account controlled by Co-Conspirator-4 and subsequently passed along to ADEBO.

26.    As another example of the corporate BEC schemes, in or about April 2021, a title insurance company located in Sacramento, California, an entity the identity of which is known to the Grand Jury ("Victim-5"), received an email purporting to be from a bank to which Victim-5 owed payments in connection with a real estate transaction. The email informed Victim-5 that a final payment statement would be provided by fax. However, this email was fraudulent and was not sent by the bank. On or about April 23, 2021, Victim-5 received the statement via fax, which included wiring instructions. On or about April 27, 2021, Victim-5 wired approximately $3,920,275 to the bank account provided in the faxed statement.

27.    The account that received Victim-5's $3,920,275 payment belonged to an escrow attorney, an individual the identity of whom is known to the Grand Jury ("Escrow-Attorney-3"). Escrow-Attorney-3 had been contacted by Co-Conspirator-2, who, using a fake name, requested that Escrow-Attorney-3 help facilitate the payment of a legal settlement between two companies. Co-Conspirator-2 requested that Escrow-Attorney-3 pass the funds

8

along to specified accounts to execute the settlement. In fact, Escrow-Attorney-3 received Victim-5's payment and passed it along to two corporate bank accounts controlled by Co-Conspirator-5, among other accounts. Shortly after receiving the wire transfers, Co-Conspirator-5 used the funds to purchase three cashier's checks payable to Q&A LLC, the corporate entity registered to the defendant IDOWU ADEMOROTI. The checks were deposited into two corporate bank accounts for Q&A LLC controlled by ADEMOROTI. At the direction of the defendant ANIMASHAUN ADEBO, Co-Conspirator-4 then, together with ADEMOROTI, laundered a portion of those funds by unlawfully trading them to individuals overseas who were seeking to trade Nigerian naira for United States dollars, with naira ultimately being deposited into Nigerian accounts controlled by Co-Conspirator-4 and by ADEBO.

28.    In or about and between April and September 2021, the defendant IDOWU ADEMOROTI laundered fraudulent proceeds from at least two other BEC schemes in substantially the same manner. In total, Co-Conspirator-4 and ADEMOROTI laundered over one million dollars through the unlicensed money transmitting business run by ADEMOROTI, at the direction of the defendant ANIMASHAUN ADEBO.

29.    In or about and between April 2021 and March 2022, the defendant ANIMASHAUN ADEBO received over one million dollars in funds and luxury watches derived from fraudulent proceeds. During this timeframe, ADEBO, the defendant IDOWU ADEMOROTI, and Co-Conspirator-1 through Co-Conspirator-5 helped to misappropriate or launder funds in connection with BEC schemes that together resulted in more than $50 million in victim losses.

## COUNT ONE
### (Wire Fraud Conspiracy)

30.     The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

31.     In or about and between April 2021 and March 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud individuals and businesses by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: emails and other electronic communications and money transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Money Laundering Conspiracy)

32.     The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

33.     In or about and between April 2021 and March 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," and IDOWU ADEMOROTI, together with others, did knowingly and intentionally conspire:

        (a)     to transport, transmit, and transfer monetary instruments and funds from one or more places in the United States to one or more places outside the United States, and

from one or more places outside the United States to and through one or more places in the United States, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i);

(b)      to conduct one or more financial transactions in and affecting interstate and foreign commerce, which transactions in fact involved the proceeds of one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that such transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(c)      to engage in one or more monetary transactions, to wit: deposits, withdrawals, transfers and exchanges of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property of a value greater than $10,000 and derived from one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT THREE
(Operation of an Unlicensed Money Transmitting Business)

34.     The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

35.     In or about and between April and September 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IDOWU ADEMOROTI, together with others, did knowingly conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit: a currency exchange business, which (a) operated without an appropriate money transmitting license in the State of Wisconsin, where such operation is punishable as a misdemeanor and a felony under Wisconsin State law; and (b) failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder.

(Title 18, United States Code, Sections 1960(a), 2 and 3551 et seq.)

## COUNT FOUR
(Conspiracy to Receive Stolen Money)

36.     The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

37.     In or about and between September 2021 and March 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," and IDOWU ADEMOROTI, together with others, did knowingly and willfully conspire to commit and cause the commission of an offense against the United States, to wit: a violation of Title 18, United States Code, Section 2315.

12

38.     It was part and object of the conspiracy that the defendants ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," and IDOWU ADEMOROTI, together with others, would and did receive, possess, conceal, store, barter, sell and dispose of goods, wares, merchandise, securities and money, of the value of $5,000 and more, which had crossed a state and United States boundary after being stolen, unlawfully converted and taken, knowing the same to have been stolen, unlawfully converted and taken, contrary to Title 18, United States Code, Section 2315.

39.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," and IDOWU ADEMOROTI, together with others, did commit and cause to be committed, among others, the following:

OVERT ACTS

(a)     On or about July 12, 2021, ADEMOROTI received approximately $120,000 of Victim-1 fraud proceeds by cashier's check in a Q&A LLC bank account he controlled.

(b)     On or about July 16, 2021, ADEMOROTI received approximately $123,000 of Victim-1 fraud proceeds by cashier's check in a Q&A LLC bank account he controlled.

(c)     On or about July 16, 2021, ADEBO received four separate wires of Nigerian naira, each worth approximately $24,000 and derived from Victim-1 fraud proceeds, in a Nigerian bank account he controlled.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT FIVE
### (Receipt of Stolen Money)

40.    The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

41.    In or about and between September 2021 and March 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ANIMASHAUN ADEBO, also known as "Kazeem" and "Kazeem Animashaun," and IDOWU ADEMOROTI, together with others, did knowingly and intentionally receive, possess, conceal, store, barter, sell and dispose of goods, wares, merchandise, securities and money, of the value of $5,000 and more, which had crossed a state and United States boundary after being stolen, unlawfully converted and taken, to wit: ADEBO and ADEMOROTI received proceeds of fraudulent schemes that were transferred from bank accounts in the United States to bank accounts located in other states and in Nigeria.

(Title 18, United States Code, Sections 2315, 2 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE, FOUR AND FIVE

42.    The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One, Four and Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

43.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      (a)    cannot be located upon the exercise of due diligence;

14

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TWO AND THREE

44.    The United States hereby gives notice to the defendants that, upon their

conviction of either of the offenses charged in Counts Two and Three, the government will seek

forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any

person convicted of such offenses to forfeit any property, real or personal, involved in such

offenses, or any property traceable to such property.

45.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided

15

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))


A TRUE BILL

s/
FOREPERSON

By Carolyn Pokorny, Assistant US Attorney

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK


16